E-FILED
Tuesday, 14 June, 2016  04:04:19 PM
Clerk, U.S. District Court, ILCD

IN THE
**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| DAVID EARL TUCKER,<br>        Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>        Defendant. | Case No. 1:15-cv-01188-JEH |

### Order and Opinion

Now before the Court is the Plaintiff David Earl Tucker's Motion for Summary Judgment (Doc. 8) and the Commissioner's Motion for Summary Affirmance (Doc. 14). For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[1]

### I

In April 2010, Tucker applied for disability insurance benefits (DIB) alleging a disability onset date of January 30, 2010. An ALJ held a hearing and issued a decision in January 2012, finding that Tucker was not disabled. Tucker appealed that decision to the United States District Court for the Central District of Illinois on February 1, 2013. The parties then stipulated to a remand and the Court ordered remand in the case in December 2013 for further proceedings. The Appeals Council then issued an order remanding Tucker's claim on February 26, 2014. On July 7, 2014, a second hearing was held before the Honorable David W.

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 5) on the docket.

Thompson (ALJ), and at that time Tucker was represented by an attorney. Following the hearing, Tucker's claim was denied on July 23, 2014. His request for review by the Appeals Council was denied on March 17, 2015, making the ALJ's Decision the final decision of the Commissioner. Tucker filed the instant civil action seeking review of the ALJ's Decision[2] on May 11, 2015.

## II

At the time he applied for DIB in April 2010, Tucker was 39 years old living in Chillicothe, Illinois with his wife, Terri. In an undated Form SSA-3368, Tucker indicated that the physical or mental conditions that limited his ability to work included Type 1 Bipolar disorder, manic depression, ADHD, and ankle problems. He had previously worked as a forklift driver and a grinder.

At the first hearing on October 6, 2011, Tucker testified that he obtained his GED and last worked in January 2009. He testified that he was on medications but that he did not believe he was 100% while on them because he still experienced many issues that the medications were supposed to treat. Tucker testified that a typical panic attack he experienced started with him experiencing stress and nervousness which turned into pain similar to a heart attack across his chest and he would feel "jittery" and "shaky." AR 60. He explained that he would then have to go sit and relax somewhere or to step out of the room to ease his mind. He further explained that during a panic attack, his outlook would change and his mood would swing to an angry state.

Tucker also testified about his daily activities. He said that he did not read because he could not concentrate long enough and he did not spend time on the computer. He said he would go out and walk around in his yard to enjoy nice weather. He testified that his memory and mood swings prevented him from

---

[2] The ALJ's Decision dated July 23, 2014 is the Decision at issue and so all future references to the "Decision" in this Order and Opinion are to that July 23, 2014 Decision unless otherwise noted.

working, as his mood would change within a minute.  He explained that he became nervous and "jittery" at the smallest thing and even became that way around people he had known his whole life.

Upon questioning by his attorney, Tucker stated that following a panic attack at which time he tried to calm down, he would be unable to do anything else in order to clear his mind.  He testified to experiencing panic attacks up to three times per week.  Tucker further testified that he had difficulties with other people in the grocery store insofar as he became easily angered by them, would get "in their face," and became very loud.  AR 66.  Tucker testified that he was unable to leave his home without his wife because he needed someone there with him to complete him and to keep him together.  He also testified that in a work environment, Tucker would tell the person what he thought about him/her and would again be in his/her face if a person corrected him.  He testified that such a reaction was not deliberate.

Tucker testified that he would not be better in a circumstance where there was someone there to guide him and make sure he did not get distracted in order to complete tasks, and he knew that because he had Terri try that with him and it did not work.  Tucker testified to a previous instance when he was on the computer and Terri attempted to help him with an issue he had and upon her attempting to help him, Tucker became stressed out and told her to get away. Tucker stated that his mood swings came and went, and he was aware of when a shift occurred between his moods.

Tucker's wife Terri next testified.  She testified that she had known her husband for approximately 20 years and that she did notice a change in his mood swings in 2010.  She explained that Tucker's mood swings became more extreme. She further explained that he encountered difficulties with his mood swings in the grocery store in that he became more agitated and verbal.  Terri testified that

3

there were several times when Tucker confronted strangers after he became agitated. She testified similarly to Tucker that he became agitated when someone would correct him. Terri stated that Tucker still had problems with his moods even after receiving ECT therapy.[3]

Upon questioning by the ALJ, Terri testified that Tucker had previously been arrested for getting into the faces of other people, but Tucker had not been arrested for that reason within the two years preceding the hearing. Terri also testified that Tucker had not been expelled from any retail places or grocery stores in the last two years. She explained that she usually took Tucker out of a situation that would otherwise lead to him accosting people in public.

The ALJ thereafter questioned Tucker again, seeking clarification to the question of whether he spent time on the computer as he gave different answers. Tucker then answered that he did spend time on the computer, though not much time. Tucker's attorney followed up with Terri regarding past incidents in the grocery store. Terri testified that the incidents could have become worse had she not been there with Tucker. She explained that she attempted to remove Tucker from whatever situation caused him to act out in order to calm him down.

Following the District Court's remand order in December 2013 and the Appeals Council's further remand order in February 2014, the ALJ elicited additional testimony from Tucker as well as a medical expert, Jeffrey Andert, at the July 7, 2014 hearing.

Dr. Andert testified that he was a board certified clinical psychologist that he was called to testify as a medical expert, and that he reviewed the records in the case. Dr. Andert clarified with the ALJ that the time period he was supposed to consider when answering questions was from January 30, 2010 through March

---

[3] Electroconvulsive therapy.

31, 2014.  Dr. Andert testified that he had sufficient objective medical and diagnostic evidence to establish the presence of a medically determinable mental impairment and testified that Tucker's impairments included bipolar disorder. Dr. Andert cited to the objective medical evidence of record he used to reach his conclusions.  Dr. Andert stated further that bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of manic and depressive syndromes was also supported by the record.

Dr. Andert also testified that there was sufficient objective medical evidence to assess the degree of functional limitations Tucker's impairment imposed.  In that regard, Dr. Andert testified to mild restriction in Tucker's activities of daily living, moderate restriction of activities of social functioning, moderate restriction in concentration, persistence, and pace, and no episodes of decompensation, each of extended duration.  Dr. Andert noted that Tucker did have a tendency to withdraw from others at times, and he had some indication of some irritability in his interpersonal relationships.  When asked whether there were any findings or opinions within the documentary evidence which were in conflict with each other, Dr. Andert testified that:

> There were some statements and ratings with regard to the claimant's residual functional capacity by some treaters, particularly Dr. Frankel [sic], for example, in exhibit 24F, that indicated marked functioning, marked limitations in a majority of the areas of functioning that I didn't view as consistent with the progress notes and medical records for that particular treater.
>
> That they indicated greater functional limitations than one would surmise from the actual documentary evidence.  That would be the only inconsistency that I noted.

AR 1019-20.  The following colloquy then ensued between the ALJ and Dr. Andert:

 Q.    If I were to indicate that because of the individual's mental impairments and symptoms combined, the individual may during of [sic] symptoms [sic] exacerbation have moderate limitations in one, concentration, persistence  and or [sic] pace, when attempting complex or detailed tasks.

So the individual is limited to jobs that do not require complex or detailed job processes.  Little in the way of change in job process from day to day.  Jobs that can be learned in 30 days or fewer.  And jobs with multi-step, self-evident tasks easily resumed after momentary distraction.

And two, social functioning so the individual is limited to jobs that do not require more than occasional work related interaction with the public, co-workers and supervisors.   Would those limitations be consistent with your opinion of this case?

A.    Yes.

* * *

A.    The only addition I would make is that I think he would precluded [sic] from any type of fast paced work environment, that being any production line type activity in addition to the restriction that in terms of the types of tasks you described.

Q.    Okay.  So if I were to say that the individual would be limited to jobs with only an average production quota, meaning a quota measured over the entire shift as opposed to any lesser period to time - -

* * *

Q.     - - would that be satisfactory?

A.    It would.

AR 1021-22.

Tucker's attorney then questioned Dr. Andert.  The attorney asked Dr. Andert to give an opinion on Dr. Donald R. Legan, Ed.D., Clinical Psychologist's findings contained with a Psychological Evaluation dated April 28, 2012.  The attorney pointed out that Dr. Legan provided a narrative based upon testing he performed and an opinion questionnaire, both of which, the attorney noted, indicated "markedly limited" in many areas of work performance.  The ALJ asked "if you [Dr. Andert] could give - - in terms of the relevance of what Dr.

6

Legan's testing was, and how that - - the impairment questionnaire that he completed would relate to the testing that he did, and the narrative that he provided?"  AR 1022-23.  The attorney pointed Dr. Andert to specific opinions shared by Dr. Legan in his Psychological Evaluation, including Dr. Legan's indication of Tucker's "marked limitations" in particular areas.   Dr. Andert testified:

> A.    The evaluation that I have, Dr. Legan primarily included administration of the MMPI [Minnesota Multiphasic Personality Inventory-II].  And unfortunately we don't have the actual MMPI profile to know what the scores were so I'm at a bit of a disadvantage.  He provided a narrative interpretation.

> However I can't really comment on the actual profile not having seen that.  He relied heavily on the MMPI, and there's very little in the evaluation with regard to a review of the claimant's functioning in various areas that I think would correlate directly to the RFC ratings that followed.

> He also - - I would take his test results assuming the validity as he described as supportive of the affective disorder that I indicated.  So I think that was certainly one of the exhibits I considered in supporting the affective disorder.

> But he also points out that in his opinion, the MMPI profile is highly related to an individual with substance abuse issues.  Although he does note in his diagnoses that the alcohol abuse is in remission which is consistent with the remainder of the record.

> So I think excluding the impact of substance use, the remainder of that interpretation I think supports the affective disorder.  I have some difficulty knowing how he drew the conclusions that he did with regard to all those specific functional areas relying solely on the MMPI test results.  And again some of those conclusions in my opinion are not consistent with the remainder of the record.

AR 1025-26.  The attorney questioned Dr. Andert further, stating:

> Q.    And in talking about the - - is it reasonable to believe that a claimant such as Mr. Tucker would experience periods of worsening symptoms particularly when exacerbated by stress?

> A.      They could.
>
> Q.      Okay.  Could?  And so would it also be reasonable to believe that under those periods of stress that the level of functioning might actually reach a level where he would have marked difficulties in some of these areas?
>
> A.      There could be, and with most individuals there's some variability in functioning from time to time so that the ratings I think tend to be a summary, and the best guess if you will as to the predominant level of functioning for an individual.
>
> It's possible that the claimant may rise to a greater level of limitation at some point in time.  I - - he - - in my review of the record that did not occur to the extent that he required more intensive treatment than he was receiving, nor that it would have been on an extended basis which would warrant rating his limitations into the marked range.

AR 1026-27.   Dr. Andert further testified that there could be symptom exacerbation in an employment setting and that it was possible that Tucker might experience marked limitations if he were placed in a competitive work environment.  Dr. Andert went further and explained, "I don't think that we have enough evidence to be able to predict it in terms of reasonableness, that it's likely to occur with any great probability."  AR 1027.

Tucker's attorney proceeded to question him.  Tucker testified that as of his alleged disability onset date, he knew then that he needed to do something about his inability to work.  He explained that he had too much stress and that he would get mad at others over nothing.  He stated that his manic side put him in a rage and that he became like that "[q]uite often here lately."  AR 1029.  Tucker stated that he had a depressed side too and he usually felt depressed once a week.  He testified that the typical situations that caused him stress were his previous job where he became stressed out and snapped at his bosses.  Tucker also testified that he previously did not need as much time to calm down following a stressful situation that it currently did.  He stated that he walked out

of stressful situations and tried to avoid stressful situations since January 30, 2010.  Tucker answered that he did not have any physical confrontations since January 30, 2010, though he still became angry with people very easily.

### III

In his Decision, the ALJ determined that Tucker had the severe impairments of back disorder, ankle problems, obesity, and a bipolar disorder. He formulated Tucker's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he was limited to occasional ramps, stairs, ladders, stooping, kneeling, crouching and crawling with no ropes or scaffolds and needed to avoid concentrated exposure to unprotected heights.  Because of all his mental impairments and symptoms combined, he may during times of symptoms exacerbation have moderate limitations in (1) concentration, persistence and/or pace when attempting complex or detailed tasks, so he is limited to jobs that do not require complex or detailed job processes, little in the way of change in job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks, easily resumed after momentary distraction; limited to jobs with only average production quotas (any quota is based on the entire shift and not on a lesser period of time) and (2) social functioning, so he is limited to jobs that do not require more than occasional work-related interaction with the public, co-workers and supervisors.

AR 989.  In order to formulate that RFC, the ALJ discussed the evidence of record regarding Tucker's physical and mental impairments.[4]

The ALJ recited Tucker's medication for his bipolar disorder and Tucker's indication of how often he saw his treating psychiatrist, Dr. Abraham R. Frenkel,

---

[4] Tucker states in his Motion for Summary Judgment that he does not dispute the ALJ's findings related to his physical impairments, and so his summary of the evidence focuses exclusively on his mental impairments.  This Order and Opinion is therefore likewise limited in focus.

M.D.   The ALJ recited Tucker's testimony at both hearings as well as his wife Terri's testimony at the first hearing.   The ALJ indicated Tucker's answers in his May 2010 Adult Function Report including that his wife took care of him, he spent time sitting around, standing and walking around trying to do things, he fed and watered his pets and plants, and he shopped once a week which took all day.   The ALJ also indicated Tucker's later answers in June 2010, October 2011, and August 2013 regarding his daily activities.

The ALJ also noted that Tucker received mental health treatment since his alleged onset date, specifically psychiatric treatment from Dr. Frenkel every two to three months.   The ALJ discussed Dr. Frenkel's progress notes dated beginning in July 2009, including that Tucker was to receive electroconvulsive therapy (ECT) in October 2010.   After stating that "the record is not consistent with mental disability," the ALJ considered Dr. Frenkel's January 2011 statement in which he opined that Tucker's condition was not stable enough to engage in regular gainful employment.   The ALJ also considered Dr. Frenkel's September 2011 assessment of Tucker in which he opined as to Tucker's various "marked limitations."   The ALJ pointed out that he requested clarification from Dr. Frenkel regarding his statements and opinions, and then the ALJ included Dr. Frenkel's responses, including that his "impression was based on his clinical condition when he first started seeing me, reports from the patient and his wife about his condition in social and home situations, as well as my best professional judgment as to his ability to be able to function in a typical stressful environment as an employee in the next year (Exhibit 27F)."   AR 993.

The ALJ then stated:

> After considering all the evidence, the undersigned gives great weight to the testimony and opinions of board-certified clinical psychologist Dr. Andert, who reviewed the entire record and listened to the testimony at the second hearing.   Little weight is

given to the opinions of treating source Dr. Frenkel, as they are out
of proportion to the record.

AR 993.  The ALJ proceeded to include the part of Dr. Andert's testimony in
which he explained that Dr. Frenkel's opinion of Tucker's marked limitations
was inconsistent with Dr. Frenkel's own progress notes.  The ALJ went on to
consider Dr. Frenkel's and Dr. Andert's opinions alongside Dr. Alan W. Jacobs,
Ph.D.'s June 29, 2010 Psychological Evaluation, Dr. Donald R. Legan, Ed.D.,
Clinical Psychologist's April 28, 2012 Psychological Evaluation, and consulting
psychologist Dr. Paul R. Sather, Ph.D's August 6, 2013 Mental Status Evaluation.
Thereafter the ALJ stated, "Functional restrictions also fail to establish a
disabling mental condition, and the undersigned gave significant weight to Dr.
Andert's credible opinions regarding these ratings."  AR 994.

When addressing Tucker's moderate restrictions in the ability to socialize,
the ALJ considered the *absent* record of evictions, altercations, or severe social
isolation, Tucker's comments about how friends, family, and neighbors wore on
his nerves, and Tucker's dislike of being around too many people at one time.
The ALJ explained that he observed Tucker at the first hearing to have well-
tanned arms and hands indicative of the time Tucker spent in the sun.  The ALJ
noted Tucker's cooperative and appropriate behavior at both hearings.

The ALJ noted the discrepancy between Tucker's and Terri's testimony
regarding the former's use of the computer.  The ALJ also listed the multiple
factors he relied upon for finding Tucker's allegations of "anger issues" only
partially credible:  1) the absence of evidence of police intervention or physical
altercations; 2) Tucker's admitted activities (shopping once weekly for "all day"
and enjoying having cookouts with friends; and 3) objective findings, including
the claimant's friendly and cooperative demeanor during consultative
examinations and at the hearings.  AR 995.  The ALJ highlighted Tucker's

11

testimony that he could walk away from others when he was angry and could calm himself down.  The ALJ concluded, "Despite all this evidence of intact social functioning the undersigned gave the claimant some benefit of the doubt in restricting his social interactions in a work setting in the adopted residual functional capacity."  AR 995.

The ALJ next explained what record evidence supported potentially moderate limitations in concentration, persistence and/or pace when Tucker attempted complex or detailed job tasks, and the ALJ cited to Dr. Andert's testimony, Dr. Sohee Lee, M.D.'s finding that Tucker was free from a thought disorder or perceptual disorder, Dr. Jacobs's finding that Tucker's long-term memory function was mildly to moderately impaired and his short-term memory was mildly impaired, and Dr. Frenkel's November 2013 and April 2014 progress notes that Tucker's concentration and attention were intact.

Finally, the ALJ stated:

> As for the opinion evidence, the opinions of State Agency physicians were not given significant weight.  These physicians did not have the benefit of reviewing the latest medical evidence or assessing the claimant's credibility at hearing.

AR 996.

### IV

Tucker argues that the ALJ erred by:  1) failing to properly weigh the medical opinion evidence; and 2) failing to make appropriate credibility determinations.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)      suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Tucker claims error on the ALJ's part at Step Four.

## A

Tucker argues that the ALJ failed to properly weigh the medical opinions of record where the ALJ gave "little weight" to treating Dr. Frenkel's opinions, gave "great weight" to the testimony from non-examining psychologist Dr. Andert, and did not state what weight, if any, was given to the opinions from any of the examining medical sources.  Tucker argues, in particular, that Dr. Frenkel's findings were consistent with his treatment notes, and his opinions were based upon appropriate clinical and diagnostic findings which were uncontradicted by other substantial evidence of record.  Tucker also argues that

14

even if Dr. Frenkel's opinions were not entitled to controlling weight, the ALJ failed to proceed to the second part of the requisite analysis to determine the weight due his opinion after consideration of the factors in 20 C.F.R. 404.1527(d)(2)-(6).  The Commissioner counters that the ALJ properly gave less weight to Dr. Frenkel's opinions based upon lack of support by his own treatment notes, noted inconsistencies between the opined "marked" limitations and progress notes, and treatment records that supported the "little weight" assigned to his opinions.  The Commissioner further argues that the ALJ's Decision clearly shows that the ALJ considered several of the regulatory factors in 20 C.F.R. § 404.1527.

Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).  If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider:  1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion.  20 CFR § 404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, the ALJ correctly weighed the medical opinions of record, and specifically made no error regarding the "little weight" he assigned to Dr. Frenkel's opinions.  The ALJ explained that Dr. Frenkel's opinions were entitled to little weight because they were out of proportion to the record.  Before reaching that conclusion, the ALJ detailed Dr. Frenkel's September 25, 2011

statement, Dr. Frenkel's September 2011 assessment of Tucker, and Dr. Frenkel's clarification regarding his statements and opinions about Tucker which was done at the ALJ's request. The ALJ also identified particular instances where Dr. Frenkel's opinions were at odds with other record evidence, and the ALJ pointed out that Dr. Andert testified that the marked limitations to which Dr. Frenkel opined were not consistent with Dr. Frenkel's own progress notes. Simply put, the ALJ pointed to substantial evidence of record which contradicted Dr. Frenkel's opinions and which was further supported by Dr. Frenkel's own records.

For instance, the ALJ pointed out that Tucker did not require hospital or emergency room visits for his bipolar symptoms since his October 2010 admission for possible ECT treatments. The ALJ also noted Dr. Jacobs's mild rating for Tucker's psychomotor retardation and Dr. Sather's evaluation which indicated no psychomotor agitation or retardation. Tucker's arguments to defeat those particularly identified portions of the record which the ALJ cited to support his conclusion that Dr. Frenkel's opinions deserved only "little weight" are unavailing.

First, as the Commissioner argues, the ALJ did not equate the lack of hospitalization with a finding that Tucker did not have disabling impairments. Instead, the ALJ highlighted that fact to illustrate how Dr. Andert's testimony was credible and supported by the record evidence. Second, Tucker would have this Court do what it cannot insofar as he recites the evidence of record (cited by the ALJ) which he says amply supports Dr. Frenkel's opinions. Tucker cannot expect the Court to play doctor where ALJs are precluded from doing so, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), and the Court may not reweigh the evidence or resolve conflicts in the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Lastly, nowhere in the Decision does the ALJ state that Dr.

Andert's testimony was incredible that Tucker could experience worsening symptoms leading to marked difficulties. Instead, the ALJ openly discussed Dr. Andert's testimony from the supplemental hearing on July 7, 2014, that "there could theoretically be times that [Tucker] could have marked concentration deficits," but the ALJ immediately followed with Dr. Andert's testimony that the record did not show deficits rising to that level. AR 995. The ALJ did not discuss a line of record evidence favorable to his conclusion to the disregard of entire line of contrary evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (stating that it was worth repeating that an ALJ may not ignore an entire line of evidence that is contrary to his findings). Rather, he discussed the record evidence that both supported and detracted from his conclusion that Dr. Frenkel's opinions deserved only "little weight." In doing so, the ALJ supported his decision regarding the weight due the different medical opinions with substantial record evidence.

Moreover, the ALJ's committed no error in his application of the regulatory factors under 20 C.F.R. § 404.1527. Here, the Court can easily trace the path of the ALJ's reasoning as it pertained to Dr. Frenkel's opinions and his treatment notes, and thus, the Court is assured that the ALJ considered the importance evidence. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ identified the length, nature, and extent of Tucker's and Dr. Frenkel's treatment relationship, the frequency of examination, Dr. Frenkel's specialty, and the consistency and supportability of Dr. Frenkel's opinions (as discussed above). *See Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) (explaining that the ALJ's failure to explicitly weigh each

17

factor under 20 C.F.R. 404.1527 was not a problem where his decision made clear that he was aware of an considered many of the factors).

As for Tucker's arguments that the ALJ did not state what weight, if any, was given to the opinions from any of the examining medical sources and that Dr. Frenkel's findings are consistent with findings from the government's own examining psychologists, those arguments are not sufficiently developed and will be addressed no further.  *See U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

**B**

Next, Tucker argues that the ALJ erred in assessing Tucker's own credibility as well as his wife Terri's credibility.  In support of his argument, Tucker identifies the evidence in the record that the ALJ used to support his credibility assessment, and Tucker contends that the ALJ mischaracterized that evidence.  Tucker further argues that the Seventh Circuit Court of Appeals has found reversible error when an ALJ fails to weigh the credibility of an important lay witness by giving specific reasons germane to the testimony for finding it not credible.  He argues that the ALJ should have made more specific findings with respect to Terri's testimony about her husband's impairments.  The Commissioner disputes that the ALJ's credibility determination was patently wrong, and she argues that the ALJ detailed specific reasons for finding that Tucker's allegations were not fully credible and provided an evidentiary basis for his credibility finding.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong.  *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record,"

and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ must provide "enough detail and clarity to permit meaningful review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). A credibility finding "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

The ALJ's credibility determination was not patently wrong. Tucker asks the Court to read the parts of the ALJ's Decision pertaining to credibility much too literally and in isolation from the entirety of the Decision. However, an ALJ's decision is to be read as a whole and with common sense. *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010). Upon reading it that way, the Court can easily trace the path of the ALJ's reasoning regarding Tucker's and his wife's credibility and so the Court understands why the ALJ found Tucker only partially credible. The ALJ stated that "[r]elevant credibility factors fail to support a finding of complete disability." AR 991. He then proceeded to list the evidence in the record in support of that finding. The ALJ noted his own observations of Tucker at both hearings ("no observable discomfort"), the medications Tucker did *not* use to treat pain, and the daily activities Tucker engaged in shopping once a week, all day. The ALJ also detailed Tucker's bipolar disorder including his subjective reports, his treatment with a psychiatrist, his medications and their side effects, and his need to relax for an hour after experiencing a panic attack. The ALJ also detailed the relevant portions of Tucker's medical records and the results of assessments done by various medical sources.

The ALJ went into greater details about Tucker's moderate restrictions in his ability to socialize, noting that there was no record of evictions, altercations,

19

or severe social isolation.  The ALJ again noted that Tucker went places such as shopping once a week for a whole day, he reported in June 2010 that he enjoyed having cookouts with friends, and he was cooperative and appropriate at both hearings.  With regard to Tucker's "anger issues," the ALJ noted discrepancies with Tucker's testimony and his wife's, listed the "multiple factors" that he considered to find Tucker's allegations only partially credible, and discussed that Tucker testified he could walk away from others when he was angry and could calm himself down.  AR 995.  Also, as the Commissioner argues, the ALJ made clear in his Decision where there were inconsistencies between Tucker's testimony and the record which the ALJ found to detract from Tucker's credibility.

The ALJ stated earlier in his Decision, after reciting Terri Tucker's testimony from the first hearing, that:

> For the reasons discussed as to finding the claimant's statements to be less than fully credible, the undersigned finds this third party statement concerning the intensity, persistence and limiting effects of the claimant's symptoms inconsistent with the objective medical record and relevant credibility factors, and therefore not credible to the extent it is inconsistent with the above residual functional capacity assessment.

AR 992.  Though the ALJ made that finding earlier in his discussion of the record evidence, the ALJ's ensuing discussion of the record evidence (as detailed above) provides ample support for the ALJ's finding that Terri was less than fully credible.  Though the ALJ may have used some conclusory phrases when discussing Terri's testimony, the ALJ did not use conclusory phrases when discussing Tucker's credibility.  Because Terri's testimony was so similar to that of her husband's, the ALJ cannot be faulted for the way he addressed Terri's credibility.

**V**

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 8) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 14) is GRANTED.  This matter is now terminated.

*It is so ordered.*

Entered on June 14, 2016.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE